

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-20-00399-CV

**CIRRUS DESIGN CORPORATION**,
Appellant

v.

Sydney **BERRA**, Individually and as Personal Representative of the Estate of Lee Berra,
and on behalf of his surviving parents, Philip Berra and Ellen Berra,
Appellee

From the 408th Judicial District Court, Bexar County, Texas
Trial Court No. 2019CI01530
Honorable Monique Diaz, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:       Patricia O. Alvarez, Justice
               Irene Rios, Justice
               Beth Watkins, Justice

Delivered and Filed: August 25, 2021

AFFIRMED

Appellant Cirrus Design Corporation is a Minnesota-based aircraft manufacturer. Cirrus was sued for products liability in Texas, after one of its planes was involved in a fatal crash in Bexar County, Texas. Cirrus filed a special appearance, which the trial court denied. On appeal, Cirrus argues the trial court lacks personal jurisdiction over it because it is not "at home" in Texas and because the claims against it do not arise from or relate to any purposeful activity it conducted in Texas. We affirm the trial court's order denying Cirrus's special appearance.

## BACKGROUND

Lee Berra was an Air Force major and a test pilot instructor who lived in Texas. On January 25, 2017, Major Berra was flying from the San Antonio International Airport to Stinson Memorial Airport in Bexar County, Texas, when the 2004 Cirrus SR-22 plane he was piloting crashed. Major Berra did not survive the injuries he sustained in the crash.

Major Berra owned the plane involved in the crash; however, he did not buy it from Cirrus. Major Berra had purchased the plane from third parties in June 2016. In January 2017, less than two weeks before the crash, Major Berra had taken the plane to a Cirrus-authorized service center, Cutter Aviation of San Antonio, Inc., for maintenance and repair work. The maintenance and repair work performed on the plane included the replacement of the aircraft's flap system. The parts used to perform this work were obtained from Cirrus, which had shipped the parts from its factory in Duluth, Minnesota, to Cutter Aviation in San Antonio. After the crash, an expert examined the plane wreckage and concluded that the flap system parts obtained from Cirrus and installed on Major Berra's plane had caused or contributed to the crash.

On January 24, 2019, Major Berra's wife, Sydney Berra, individually, as the personal representative of the estate of Lee Berra, and on behalf of his surviving parents, Philip Berra and Ellen Berra, (hereinafter, "Berra"), filed the underlying suit against Cirrus.[1] Berra's petition alleged multiple products liability theories, including negligence, strict products liability, and breach of implied warranties.[2] Berra alleged that Cirrus, a foreign corporation conducting business in Texas, "was in the business of the design, manufacture, distribution and sale of aircraft and in

---

[1] Other defendants, including Cutter Aviation, were also named in the suit.

[2] A "[p]roducts liability action" is defined as "any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories." *See* Tex. Civ. Prac. & Rem. Code Ann. § 82.001(2).

the regular course of its business designed, manufactured, distributed and/or sold the aircraft at issue herein." Additionally, Berra alleged that in January 2017 Cutter Aviation performed inspections and maintenance work on Major Berra's 2004 Cirrus SR-22 aircraft, "including but not limited to routine maintenance, maintenance management, maintenance consulting services, maintenance instruction, [and] assistance and training on [Major Berra's aircraft], said work being complete on or about January 24, 2017." Berra further alleged that "on or about January 25, 2017, decedent Lee Berra, was operating the 2004 Cirrus SR-22 aircraft at issue herein from San Antonio International Airport to Stinson Municipal Airport, in a manner reasonably anticipated, when said aircraft suddenly and unexpectedly lost control and crashed causing Lee Berra to suffer severe injuries resulting in his death."

Cirrus filed a special appearance, asserting the trial court lacked personal jurisdiction over it. More specifically, Cirrus asserted that it was a Minnesota-based aircraft manufacturer, incorporated in Wisconsin, and was "not subject to general personal jurisdiction in Texas because it is not 'at home' in Texas as required under the Due Process Clause of the U.S. Constitution." Additionally, Cirrus asserted it "is not subject to specific personal jurisdiction in Texas because [it] does not have sufficient minimum contacts with Texas as [Berra's] claims do not arise from or relate to any activity Cirrus directed towards or in Texas." Cirrus asked the trial court to dismiss the claims against it for lack of personal jurisdiction.

Berra filed a response to the special appearance, arguing that the trial court had personal jurisdiction over Cirrus based on both general and specific jurisdiction. Berra attached evidence to her response, including an affidavit from her attorney and other documents. The affidavit from Berra's attorney stated that "an expert examine[d] the aircraft wreckage and he found defects in the flap system that caused the crash" and:

> [Berra's] claims against Cirrus include design, manufacturing[,] and marketing (warning and instruction) defects that rendered the subject aircraft unreasonably dangerous. In particular, a flap system failure on the subject aircraft caused and/or contributed to the crash. The information available to [Berra] indicates that the flap system was designed and manufactured by Cirrus, and all warnings and instructions regarding the system were published by Cirrus. [Berra] contend[s] that the defects within the Cirrus flap system actuator caused and/or contributed to the crash by failing and rendering the subject aircraft unreasonably dangerous.

Other documents attached to Berra's response were copies of pages from Cirrus's website showing that: (1) Cirrus had more than thirty Cirrus facilities and affiliates in Texas; (2) Cirrus had two regional sales directors in Texas; and (3) Cirrus was opening a new Cirrus service facility in McKinney, Texas, to better serve its existing customer base in the region. Also attached to Berra's response was an invoice from Cirrus showing that less than two weeks before the crash, Cirrus had sold a flap system actuator kit to one of its authorized service centers, Cutter Aviation, for installation in Major Berra's aircraft.[3]

The trial court held a hearing on Cirrus's special appearance. At the hearing, Berra conceded the trial court's personal jurisdiction over Cirrus could not be based on general jurisdiction because "you have to be either incorporated in a state or . . . have your principal operation in that state. [Berra] will concede that Cirrus does not do that." After the hearing, the trial court signed an order denying Cirrus's special appearance. Findings of fact and conclusions of law were not requested or filed. Cirrus appealed.

**PERSONAL JURISDICTION LAW AND STANDARD OF REVIEW**

Texas courts may exercise personal jurisdiction over a nonresident if the Texas long-arm statute authorizes the exercise of jurisdiction, and the exercise of jurisdiction is consistent with federal and state due process guarantees. *Moncrief Oil Int'l v. OAO Gazprom*, 414 S.W.3d 142,

---

[3]Berra also attached to her response documents showing that Cirrus was registered to do business in Texas, had a registered agent for service of process, and had filed several franchise tax public information reports in Texas. These documents are not relevant to our analysis in this case.

149 (Tex. 2013). The Texas long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant that does business in Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042. "Texas's long-arm statute extends Texas courts' personal jurisdiction as far as the federal constitutional requirements of due process will permit." *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 885 (Tex. 2017). "Asserting personal jurisdiction comports with due process when (1) the nonresident defendant has minimum contacts with the forum state, and (2) asserting jurisdiction complies with traditional notions of fair play and substantial justice." *Moncrief*, 414 S.W.3d at 150. "A defendant establishes minimum contacts with a forum when it purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id*. (quotation marks omitted).

"A defendant's contacts with the forum may give rise to either general or specific jurisdiction." *M & F Worldwide*, 512 S.W.3d at 885. "General jurisdiction is established when a defendant's contacts are so continuous and systematic as to render it essentially at home in the forum [s]tate." *Id*. (quotation marks and brackets omitted). "It involves a court's ability to exercise jurisdiction over a nonresident defendant based on any claim, including claims unrelated to the defendant's contacts with the state." *Id*. "Unlike general jurisdiction, which requires a more demanding minimum contacts analysis, specific jurisdiction may be asserted when the defendant's forum contacts are isolated or sporadic, but the plaintiff's cause of action arises out of those contacts with the state." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010) (citations and quotation marks omitted). In evaluating specific jurisdiction, courts focus on the relationship among the defendant, the forum, and the litigation. *Id*. "Specific jurisdiction is appropriate when (1) the defendant's contacts with the forum state are purposeful, and (2) the cause of action arises from or relates to the defendant's contacts." *Id*.

The plaintiff bears the initial burden to plead allegations sufficient to confer jurisdiction under Texas's long-arm statute. *Moncrief Oil*, 414 S.W.3d at 149. Once this initial burden is met, the burden shifts to the defendant to negate all bases for personal jurisdiction alleged by the plaintiff. *Id*. "In considering whether the plaintiff met her initial burden, we may consider both her petition and her response to the special appearance." *FedEx Corp. v. Contreras*, No. 04-19-00757-CV, 2020 WL 4808721, at *3 (Tex. App.—San Antonio Aug. 19, 2020, no pet.) (mem. op.); *Accelerated Wealth, LLC v. Lead Generation & Mktg., LLC*, No. 04-12-00647-CV, 2013 WL 1148923, at *2 (Tex. App.—San Antonio Mar. 20, 2013, no pet.) (mem. op.); *see* TEX. R. CIV. P. 120a ("The court shall determine the special appearance on the basis of the pleadings" and "such affidavits and attachments as may be filed by the parties.").

"The defendant can negate jurisdiction on either a factual or legal basis." *Kelly v. Gen. Interior Const., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010). "Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations." *Id*. "The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction." *Id*. "Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of personal jurisdiction." *Id*.

Whether a court may exercise personal jurisdiction over a nonresident defendant presents a question of law. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009); *Moki Mak River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). Thus, a trial court's ruling on a special appearance is reviewed de novo. *Retamco*, 278 S.W.3d at 337; *Moki*

*Mak*, 221 S.W.3d at 574. "When, as here, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the [order] that are supported by evidence." *Moncrief Oil*, 414 S.W.3d at 150. "If the parties present conflicting evidence that raises a fact issue, we will resolve the dispute by upholding the trial court's determination." *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 n.4 (Tex. 2016).

### ANALYSIS—SPECIFIC JURISDICTION

Cirrus presents two issues on appeal. In its first issue, Cirrus argues the trial court should have granted its special appearance because the trial court lacked general jurisdiction over it. In its second issue, Cirrus argues the trial court should have granted its special appearance because the trial court lacked specific jurisdiction over it.[4] With regard to specific jurisdiction, Cirrus argues: (1) its contacts with Texas fall short of purposeful availment, and (2) Berra's claims do not arise from its contacts with Texas.

On appeal, Berra does not contend the trial court has general jurisdiction over Cirrus. Rather, Berra contends the trial court has specific jurisdiction over Cirrus because Cirrus purposefully directs activities toward Texas and her claims arise from or relate to these activities. Accordingly, we focus on whether or not the trial court has specific jurisdiction over Cirrus.

"Unlike general jurisdiction, which requires a more demanding minimum contacts analysis, specific jurisdiction may be asserted when the defendant's forum contacts are isolated or sporadic, but the plaintiff's cause of action arises out of those contacts with the state." *Kimich*, 310 S.W.3d at 873. The two essential components of specific jurisdiction are commonly referred to as "purposeful availment" and "relatedness." *See Retamco*, 278 S.W.3d at 338. "The minimum contacts necessary for specific jurisdiction are established if the defendant purposefully avails

---

[4]Cirrus does not present an issue arguing that the exercise of personal jurisdiction over it would offend traditional notions of fair play and substantial justice.

itself of the privilege of conducting activities in the forum state . . . and the suit arises out of or relates to the defendant's contacts with the forum." *Luciano v. SprayFoamPolymers.com, LLC*, No. 18-0350, 2021 WL 2603840, at *3 (Tex. Jun. 25, 2021) (citations and quotation marks omitted).

*Purposeful Availment*

The touchstone of jurisdictional due process is purposeful availment. *Kimich*, 310 S.W.3d at 873. A purposeful availment analysis is based on: (1) the defendant's own actions; (2) whether the defendant's own actions were purposeful rather than random, attenuated, or fortuitous; and (3) whether the defendant sought some benefit, advantage, or profit by availing itself of the privilege of doing business in Texas. *Retamco*, 278 S.W.3d at 338-39. In conducting this analysis, we focus not on the quantity of the defendant's contacts with Texas, but on the quality and nature of those contacts. *Moncrief Oil*, 414 S.W.3d at 151.

"Under the stream-of-commerce theory of personal jurisdiction, a nonresident who places products into the stream of commerce with the expectation that they will be sold in the forum state may be subject to personal jurisdiction in the forum." *TV Azteca*, 490 S.W.3d at 46. "[S]ellers who reach beyond one state and create continuing relationships with residents of another state are subject to the specific jurisdiction of the latter in suits arising from those activities." *Kimich*, 310 S.W.3d at 873. But a seller's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum state. *TV Azteca*, 490 S.W.3d at 46. The law requires "some additional conduct—beyond merely placing the product in the stream of commerce—that indicates an intent or purpose to serve the market in the forum [s]tate." *Kimich*, 310 S.W.3d at 873 (citing *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.*, 480 U.S. 102, 112 (1987)). "Examples of this additional conduct include: (1) designing the product for the market in the forum [s]tate; (2)

advertising in the forum [s]tate; (3) establishing channels for providing regular advice to customers in the forum [s]tate; and (4) marketing the product through a distributor who has agreed to serve as the sales agent in the forum [s]tate." *Id.* (quotation marks omitted).

Because the trial court did not issue findings of fact in this case, we must imply all relevant facts necessary to support the trial court's order that are supported by evidence. *See Moncrief Oil*, 414 S.W.3d at 150. The jurisdictional evidence supports the trial court's implied findings that Cirrus marketed its aircraft products to customers in Texas and that Cirrus established channels for providing regular advice to customers in Texas. The declaration of Berra's attorney, William Angelley, states that he reviewed Cirrus's website, which listed more than thirty Cirrus facilities and affiliates in Texas and identified two regional sales directors for Texas. Angelley's declaration further states that Cirrus's website lists Cutter Aviation in San Antonio—the defendant that installed the allegedly faulty part in Major Berra's aircraft—as a Cirrus authorized service center.

Attached to Angelley's declaration are copies of webpages from Cirrus's website, confirming that Cirrus has two regional sales directors in Texas, and indicating that Cirrus has numerous facilities and affiliates in Texas.[5] Additionally, the webpages show that Cirrus's website contains a "locator" function to aid Cirrus customers in locating its facilities and affiliates in Texas.

The jurisdictional evidence also includes a press release that Cirrus placed on its website. The press release announces the opening of a new Cirrus facility in McKinney, Texas, in August 2019. Cirrus argues we cannot consider the press release because it is evidence of a Texas activity that occurred after Berra filed her petition. To support its argument, Cirrus cites *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163 (Tex. 2007). However, we have recognized that *PHC-Minden*, which analyzed general jurisdiction, is not controlling when analyzing specific

---

[5]Although Angelley's declaration states Cirrus's website lists more than thirty Cirrus facilities and affiliates, the precise number of facilities and affiliates is unclear from the webpage copies submitted with his declaration.

jurisdiction. *See Accelerated Wealth*, 2013 WL 1148923, at *3-4. Furthermore, even though the press release was issued after Berra's suit was filed, it provides evidence of a continuum of activities demonstrating Cirrus's ongoing marketing in Texas. Accordingly, we consider the press release in our analysis.

Dated May 17, 2019, the press release states:

Cirrus Aircraft announced today a new facility at the McKinney National Airport (KTKI) in McKinney, Texas that will provide a world-class customer experience for Cirrus aircraft owners in the Dallas Metroplex Area. Factory Service operations will be offered to customers beginning in August 2019, and in late 2020 the facility will expand to include a new, dedicated Cirrus Aircraft facility on site that offers flight training, maintenance and aircraft management.

….

Cirrus Aircraft conducted a nationwide search to identify the most ideal location for its first factory-direct satellite Cirrus Service facility outside of Knoxville, ultimately landing at McKinney National Airport. *In addition to the heavy concentration of Cirrus customers within the region*, McKinney National Airport offers optimal accessibility in a business-friendly environment….

….

*In addition to the growth of amenities in services offered to customers in the region*, the Cirrus Services facility in McKinney will eventually bring an additional 30 jobs to the local community….

(Emphasis added). Thus, in addition to announcing Cirrus's decision to build a new Cirrus factory-direct satellite and service facility in Texas, the press release acknowledges that Cirrus already provides "amenities in services" to Texas customers. The press release also recognizes the "heavy concentration of Cirrus customers within the region" and characterizes the McKinney, Texas, facility as a "growth of amenities in services offered to customers in the region."

The combined force of the jurisdictional evidence—the existence of Cirrus sales directors and numerous service providers and facilities in Texas; Cirrus's efforts in assisting its customers in locating Cirrus service providers and facilities in Texas; and Cirrus's advertising of its growing

presence in Texas—demonstrates that Cirrus markets to customers in Texas and establishes channels for providing regular advice to customers in Texas. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021) (recognizing that Ford's activities in "work[ing] hard to foster ongoing connections to its cars' owners" and in distributing "replacement parts both to its own dealers and to independent auto shops in the [forum] states" was relevant to the purposeful availment analysis because "[t]hose activities, too, make Ford money.").

We now consider whether the jurisdictional facts establish that Cirrus purposefully availed itself of the benefits and protections of Texas.[6] As previously discussed, Cirrus's Texas activities demonstrate an intent or purpose to serve the market in Texas. *See Kimich*, 310 S.W.3d at 873. Cirrus has two regional sales directors in Texas and more than thirty Cirrus facilities and affiliates in Texas, and it advertises this information on its website. Cirrus's website contains a "locator" function to aid its customers in locating its sales directors, facilities, and affiliates in Texas. Furthermore, Cirrus announced its extensive plans, which were obviously the culmination of long-term planning, to open a new Cirrus factory-direct satellite and service facility in Texas to continue to serve its customers in the region. These are the types of activities that may serve as "a necessary predicate to the exercise of state-court jurisdiction." *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980) (concluding no minimum contacts existed when the nonresident defendants "carried on no activity whatsoever" in the forum state when they "solicit[ed] no business there either through salespersons or through advertising reasonably calculated to reach the [s]tate," failed to regularly sell their products to the state's residents, and did not "indirectly, through others, serve or seek to serve the [state's] market."). Importantly, the activities Cirrus directed toward Texas were purposeful, not random, fortuitous, or attenuated. *See*

---

[6]In its reply brief, Cirrus complains that Berra's brief refers to evidence that was not before the trial court. We restrict our review to the jurisdictional evidence that was before the trial court at the time it rendered its order.

*Retamco*, 278 S.W.3d at 339 ("[S]ellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities.").

"Purposeful availment requires a defendant to seek some benefit, advantage, or profit by availing itself of the jurisdiction." *Kimich*, 310 S.W.3d at 873. To satisfy the purposeful availment requirement, "the defendant's activities must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 559 (Tex. 2018) (quotation marks omitted). Here, through its activities, Cirrus sought some benefit, advantage, or profit by availing itself of the privilege of doing business in Texas. Cirrus's activities in Texas justify the conclusion that it could reasonably anticipate being called into a Texas court. *See id*. We conclude that Cirrus purposefully availed itself of the privilege of conducting activities in Texas.

*Relatedness*

"[W]hen specific jurisdiction is alleged, we focus the minimum-contacts analysis on the relationship among the defendant, the forum, and the litigation." *Moki Mac*, 221 S.W.3d at 575-76 (quotations and brackets omitted). "Specific jurisdiction is established if the defendant's alleged liability arises out of or is related to an activity conducted within the forum." *Id*. at 576. Stated differently, "there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum [s]tate and is therefore subject to the [s]tate's regulation." *Ford Motor Co.*, 141 S. Ct. at 1025 (quotation marks and brackets omitted). "We look for a substantial connection between the defendant's forum contacts and the operative facts of the litigation." *Retamco*, 278 S.W.3d at 340. "Thus, we must consider the claims involved in the litigation to determine the operative facts." *Id*. "A substantial connection can result from even a single act." *Moncrief Oil*, 414 S.W.3d at 151.

In the present case, Berra's products liability suit and her special appearance response allege that Cirrus designed and manufactured a defective product, specifically, the plane piloted by Major Berra. Berra also alleges the parts obtained from Cirrus and installed in Major Berra's plane in January 2017 caused or contributed to the fatal crash, which occurred minutes into the plane's first flight following the flap system maintenance. The jurisdictional evidence shows that Cirrus shipped the parts—a "Kit, Flap System, Actuato[r] Rigging, Model SR22 s/n 0951"—to Cutter Aviation in San Antonio, Texas. The corresponding invoice states: "Cirrus [] certifies that the items shipped on this order are in compliance with all engineering drawings and specifications and meet all quality control specifications" and "[a]ll items listed above are considered airworthy . . . ."

As a preliminary matter, we address Cirrus's argument that the invoice cannot support the existence of specific jurisdiction because it states that Cirrus shipped the parts to Cutter "F.O.B." or "Free on Board." We are unpersuaded by this argument. *See Kimich*, 310 S.W.3d at 876 ("[I]t is not persuasive that title to the [product] passed in Europe, rather than in Texas."). The term "F.O.B." means that title to property passes from the seller to the buyer at the designated F.O.B. point. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 807 (Tex. 2002). The primary purpose of an F.O.B. term in a shipment contract is to allocate the risk of damage to goods between the buyer and seller. *See, e.g., Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 472 (5th Cir. 2006). The use of the term "F.O.B." in a shipment contract does not preclude a court from exercising personal jurisdiction over a nonresident defendant where other factors show that jurisdiction is proper. *Id.*, at 471-72; *see Renner v. Lanard Toys Ltd.*, 33 F.3d 277, 282 (3d Cir. 1994) (noting that "a foreign manufacturer or seller [which] rids itself of title by a sale F.O.B. a foreign port [does not] insulate [itself] from jurisdiction if there is the other type of activity" supporting purposeful availment); *Benitez-Allende v. Alcan Alumnio do Brasil, S.A.*, 857 F.2d 26,

30 (1st Cir. 1988) (holding that title passing in Brazil "is beside the point" in a specific jurisdiction analysis).

Next, Cirrus argues that "Berra has failed to demonstrate how the flap system actuator rigging kit installed by Cutter Aviation in 2017 relates to the allegation . . . of a 'flap system' defect." According to Cirrus, Berra "wholly fails to connect the actual kit[] shipped to the defect alleged."[7] But these arguments advocate for a more stringent connection than the law requires.

The U.S. Supreme Court has rejected a strict causation-only analysis when analyzing the relatedness required for specific jurisdiction, stating: "None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activities and the litigation will do." *Ford Motor Co.*, 141 S. Ct. at 1026. "[T]he rule demands that the suit arise out of *or relate to* the defendant's contacts with the forum." *Id*. (quotation marks omitted). The "relates to" part of the standard "contemplates that some relationships will support jurisdiction without a causal showing." *Id*. Thus, the law does not require a causal connection between Cirrus's activities and Berra's claims; it simply requires that Berra's claims arise out of or relate to the activities Cirrus directed toward Texas.

Finally, Cirrus faults Berra for alleging both that Cirrus's plane had an original design and manufacturing defect and that it supplied defective parts for installation in Major Berra's plane. According to Cirrus, these allegations are contradictory. Again, we find this argument unpersuasive. Berra's allegations of an original design and manufacturing defect and defective parts are not necessarily mutually exclusive. Regardless, what matters to our specific jurisdiction analysis is whether the operative facts of Berra's claims arise out of or relate to Cirrus's Texas

---

[7]Additionally, Cirrus argues that statements Berra's attorney made in his affidavit are conclusory and speculative. However, Cirrus fails to identify and cite to the complained-of statements in its brief. Therefore, Cirrus's complaint is not adequately briefed. *See* TEX. R. APP. P. 38.1(i) (requiring an appellant's brief to contain appropriate citations to the record).

activities. We conclude they do. Berra alleged that Cirrus originally designed and manufactured a defective plane that ultimately malfunctioned and crashed in Texas. This claim clearly arises out of or relates to Cirrus's activities in serving a market for its planes in Texas. *See id*. at 1028 (concluding that specific jurisdiction over Ford, a nonresident defendant, existed for product liability claims when the company "had systematically served a market in the [forum states] for the very vehicles that the plaintiffs alleged malfunctioned and injured them in those [s]tates."). As the U.S. Supreme Court stated in *Ford Motor Co.*: "[S]pecific jurisdiction attaches in cases identical to the ones here—when a company like Ford serves a market for a product in the forum [s]tate and the product malfunctions there." *Id*. at 1027. Second, Berra alleged that defects in the flap system actuator parts distributed by Cirrus and installed in Major Berra's plane contributed to or caused the fatal crash. This claim clearly arises out of or relates to Cirrus's activities in providing the flap system actuator parts for installation in Major Berra's plane in Texas. *See id*. at 1028 (recognizing a nonresident company's distribution of "replacement parts both to its own dealers and to independent auto shops in the [forum] states" was pertinent to the minimum contacts analysis).

Both of Berra's theories of liability—that Cirrus originally designed and manufactured a defective plane and that Cirrus distributed defective parts for installation and use in Major Berra's plane—arise out of or relate to Cirrus's Texas activities. Therefore, the trial court has personal jurisdiction over Cirrus, and it properly overruled Cirrus's special appearance.

## CONCLUSION

The trial court's order denying Cirrus's special appearance is affirmed.

Irene Rios, Justice

- 15 -